UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

REBECCA ANN AKIN,

                    Plaintiff,

        v.                                          Case No. 15-C-1380

NANCY A. BERRYHILL,
Commissioner of Social Security,

                    Defendant.

## DECISION AND ORDER AFFIRMING COMMISSIONER'S DECISION

        This is an action for judicial review of the final decision of the Commissioner of Social

Security denying Plaintiff Rebecca Akin's application for Supplemental Security Income (SSI) under

Title XVI of the Social Security Act. 42 U.S.C. § 405(g). Following the denial of her application

initially and on reconsideration, Akin requested a hearing before an administrative law judge (ALJ).

ALJ Charles Muhl conducted a hearing on June 9, 2014, and on July 10, 2014, issued a decision

denying Akin's application. ALJ Muhl concluded Akin could perform jobs that existed in the

national economy and was therefore not disabled. The Appeals Council denied Akin's request for

review making ALJ Muhl's decision the final decision of the Commissioner.

        Akin challenges the Commissioner's decision because the ALJ failed to follow Social

Security Administration (SSA) rulings and regulations. Akin claims that the ALJ committed

essentially three significant errors: failed to properly weigh the opinions of her treating physicians

and the state agency physicians; failed to properly assess her credibility; and failed to include all

relevant limitations in her RFC. Based on these errors, Akin argues that the Commissioner's

decision should be reversed and the case remanded for further proceedings. Finding no error and substantial evidence to support the Commissioner's decision, I affirm.

## BACKGROUND

Akin resides with her husband, who receives social security disability benefits due to diabetes, and two minor children in Redgranite, Wisconsin. Family income consists of her husband's disability benefits and child support payments paid by her children's father. Akin applied for SSI on May 14, 2012, stating that her disability began on December 1, 2008. R. 146. She was 41 years old at the time. She claimed her fibromyalgia, rheumatoid arthritis, herniated and bulging discs in her neck, migraines, carpal tunnel in both wrists, restless leg syndrome, and poor sleep prevented her from working. R. 174. After her application was denied initially and on reconsideration, Akin requested a hearing. An ALJ held a hearing in June 2014, at which Akin, represented by counsel, and a vocational expert (VE) testified.

At the outset of the hearing, Akin amended her onset date, through counsel, to June 8, 2011, in consideration of the fact that a prior application she filed on February 22, 2011, had been denied on June 7, 2011. R. 40. Akin then testified that she completed the eleventh grade of high school but took a CNA class when she was twenty years old. R. 43. She worked as a factory worker where she cut out material to make NFL uniforms. R. 54. She also bartended and worked close to 40 hours per week. Akin testified she quit bartending in 2008 because she had trouble standing her entire shift. R. 55. There is also evidence she was let go because the bar was not making money. R. 174. In any event, Akin has not been employed since that time. *Id.*

Akin claimed she has constant neck and back pain and that her pain is everywhere. R. 46, 51. She described her back pain as "a burning kind of stabbing and then throbbing." R. 41. She

2

explained that her neck pain flows up into her head and down her shoulders and arms. R. 45. The neck pain will eventually cause a headache, which occurs a couple times a week. R. 46. She also testified about pain in her fingers and hands. *Id.* Her hands go numb and she cannot squeeze things tightly. R. 47. She claimed she has two sets of braces she wears on both hands. R. 54.

Akin claimed her back and neck pain prevented her from standing for long periods of time. R. 48. She stated that the more she does, the worse her pain gets. R. 52. She claimed she does not use an assistive device but her husband and kids help her get around. R. 49. She only goes to grocery stores where she can use an electric cart. R. 48. If she has to do dishes or cook, she pulls a chair up to the sink or stove. R. 49. She indicated she could sit in a chair for an unlimited period of time as long as she could shift around. R. 47–48. But when asked if she could perform a job that required being seated, she said she would be uncomfortable sitting in a regular chair and could sit in a recliner a little longer. R. 59.

The medications prescribed for Akin's ailments consist of Gabapentin and Percocet for pain, ibuprofen for swelling, Ropinirole for restless leg syndrome, Lidocaine patches to prevent inflamation, and muscle relaxers. R. 52–53. She testified that although her doctors suggested injections for her back, she had not gone through with the procedure. R. 60.

Medical documentation in the administrative record covers the period between 2008 and 2014. In 2008, Akin saw Gretchen Tolsma, a nurse practitioner, with complaints of leg cramping and hand pain she believed were connected to rheumatoid arthritis. R. 312. After conducting numerous tests, however, the results could neither rule in nor rule out rheumatoid arthritis. *Id.* In January 2009, Akin complained of joint and hand pain. R. 311. She reported that she took up to four Advils for pain but was not getting any relief. Ms. Tolsma referred her to a rheumatoid

3

specialist. *Id.* Akin reported back to Ms. Tolsma on February 5, 2009 complaining of stiffness, neck pain, shoulder pain, wrist pain, hand pain, hip pain, bilateral knee pain, headaches, and dizziness. R. 357. Ms. Tolsma noted Akin had full range of motion of her shoulder joints, elbow joints, and wrist joints, though there was some tenderness in her shoulder joints and upper back. R. 358. Ms. Tolsma prescribed Effexor for her pain. *Id.*

In 2010, Akin began chiropractic treatment at Redgranite Family Chiropractic. R. 303. At her initial appointment, Akin complained of neck and lower back pain and migraines. She claimed that she could not stand for more than five to ten minutes at a time or walk for more than five minutes at a time. She also reported difficulty doing housework or cleaning. *Id.* Over the following five months, Akin had fifty-one visits for manipulations. Throughout that period of time, she generally reported having pain in either her neck, back, hands, and arms. R. 290–303. Her chiropractor noted "slow but steady" progress. At her last visit on April 29, 2011, Akin indicated her pain was slightly better with some pain intensity. R. 290.

In the meantime, in January 2011, Akin presented at the Valley Neurology Clinic in Oshkosh, Wisconsin to establish care with Dr. Ahmad Haffar. R. 268. She reported she was diagnosed with fibromyalgia approximately two years prior. Though her stance and gait were normal, Dr. Haffar noted she walked with a slight limp. R. 269. He observed that she was limited with the range of motion of her cervical spine as well as on flexion, extension, lateral bending, and rotation. The range of motion in her lumbar spine was normal. She had 12 trigger points in her back. Dr. Haffar found she had symptoms of fibromyalgia, demyelinating osteoarthritis of her cervical and lumbar spine, and potentially rheumatoid arthritis. He requested a neurodiagnostic study, sedimentation rate, rheumatoid factor, ANA, and CRP. *Id.* The electromyography study was compatible with active

4

motor left C6 root impingement and irritation. R. 273. Akin returned to the Valley Neurology Clinic on February 22, 2011 complaining of neck pains and headaches. R. 267. An electroencephalogram showed diffuse nonspecific abnormalities. Dr. Haffar recommended a steroid epidural injection, but Akin declined to receive injections. *Id.*

Four days later, Akin met with Stacy Budde, a physical therapist, at Berlin Memorial Hospital, to begin physical therapy. R. 328. She complained of neck and arm pain. Akin claimed that, most of the time, she had a burning, aching pain in her neck which started at the base of her skull and radiated across both shoulders. Akin also reported that she had a constant, deep aching pain in both of her arms which felt worse with prolonged activity. She had been dropping things because of the weakness in her right hand. She stated that she had worn braces on her wrists for approximately one year. Akin further complained that she got daily headaches that started in her neck and wrapped around her head. Ms. Budde instructed Akin to continue therapy twice a week for four weeks. *Id.*

Akin presented to the emergency department at Mercy Medical Center on March 18, 2011 complaining of headaches and neck pain that were ongoing for a period of months. R. 429. She described feeling electrical-like symptoms in her upper and lower extremities that originated in her neck. *Id.* A CT scan of her head without IV contrast revealed no intracranial hemorrhage or acute intracranial findings. R. 431. X-rays of her cervical spine revealed congenital fusion of C2 and C3 as well as mild disc space narrowing and spurring at C5-6. R. 432. She was prescribed Percocet to relieve her pain and instructed to follow up with Dr. Haffar. R. 430. At Akin's next visit to the Valley Neurology Clinic in April 2011, she complained of continued neck pain and headaches. R. 266.

5

On April 28, 2011, Akin returned to the Berlin Memorial Hospital and rated her pain as a 6 to 7 out of 10. R. 331. She stated that her shoulders were sore and that she got daily headaches. *Id.* She returned to Berlin Memorial on May 3, 2011, where she presented ongoing issues of joint pain. R. 391. Dr. John Modrzynski observed that Akin had increased pain when she moved her neck. *Id.* On the same day, she saw Dawn Groves, a physical therapist, and complained of pain in her head, neck, and arms. R. 332. She reported numbness and tingling in her left hand. She claimed she could only hold things with her right hand. Ms. Groves instructed her to continue therapy. *Id.* The following week, Akin saw Ms. Groves, complaining that she continued to get headaches every day. R. 334. Ms. Groves noted Akin needed to sit down and take breaks often. Akin felt relief with electric stimulation. Ms. Groves again told her to continue her therapy appointments. *Id.* On May 16, 2011, Akin stated that she did not feel any improvement since starting physical therapy. She reported she continued to have high pain levels with frequent headaches. Ms. Budde noted Akin had poor tolerance and discontinued Akin's physical therapy. *Id.*

In July 2011, Akin returned to the Valley Neurology Clinic reporting that her fibromyalgia acted up with warm and humid weather. R. 399. She indicated her severe pain caused her to sit in her recliner most of the day. Dr. Haffar increased her dose of Gabapentin for the pain. *Id.* Dr. Haffar saw Akin again on October 17, 2011, and then on February 14, 2012, for rechecks and medication renewals. She continued to complain of aches and pains in her joints, and examination showed trigger points. R. 396–97.

On March 4, 2012, Akin went to the emergency room with complaints of severe back pain and generalized pain associated with her fibromyalgia. R. 418. She claimed the symptoms were alleviated by nothing and aggravated by any movement. She had no spinal tenderness and had full

range of motion.  *Id.*  Akin was discharged home once her condition was stabilized and received Percocet and Prednisone.  R. 419.  The following day, Akin presented to the Family Health Clinic to establish care with Laurie Van Grinsven, a physician assistant.  R. 408.  She indicated that her bones had hurt for months and that her hands, hips, and toes ached.  Her biggest goal was to increase mobility.  *Id.*  Ms. Van Grinsven advised Akin to consult with a specialist.  R. 410.

Akin did see a specialist, Dr. Thomas Bartow, on May 8, 2012.  R. 402.  Akin explained that for over a decade, she has had significant musculoskeletal pain in every spot on her body.  She stated she had not worked for the last four to five years because of the pain.  She gained forty pounds in the past year.  R. 403.  Dr. Bartow noted that her hand grip was good and that her wrists, elbows, and shoulders moved well.  R. 404.  Dr. Bartow saw no evidence of inflammatory arthritis.  He observed that her fibromyalgia tender points were universally positive.  Dr. Bartow noted that Akin had iron deficiency anemia which was strongly correlated with restless legs and could also be a contributing factor to her generalized malaise and fatigue.  *Id.*  He also anticipated, however, that she was never going to feel well, but her fibromyalgia was something that could be dealt with and managed.  R. 405.

On May 26, 2012, Akin returned to the Mercy Medical emergency department, complaining of pain all over from a fibromyalgia flare-up.  R. 416.  She had no spinal tenderness and had full range of motion.  She was discharged home after being diagnosed with acute exacerbation of chronic pain and told to follow up with Ms. Van Grinsven.  R. 417.

In July 2012, Akin reported to Dr. Haffar describing pain and numbness in her lower back and her upper and lower extremities.  R. 442.  Dr. Haffar noted she walked with a pronounced limp and had multiple trigger points.  He prescribed morphine for her pain.  *Id.*  On August 2, 2012, an

7

EMG showed mild neuropathy and active left S1 root impingement. R. 441. At the end of August, Akin presented to the emergency department complaining of breathing difficulty caused by a severe cough and wheezing. R. 467–69. She indicated she wanted to quit smoking, which was most likely the precipitating cause of her bronchospasm. R. 467. Akin was discharged on a course of Prednisone, antibiotics, and inhalers until the bronchospasm completely resolved. *Id.* On November 20, 2012, Akin reported to Dr. Haffar, indicating she could not tolerate morphine. R. 440. He renewed her other medications. *Id.*

On January 13, 2013, Akin presented to the emergency department complaining of pain in her shoulders, neck, and hips. R. 464. She had moderate pain with any movement, but her symptoms improved with medication. R. 465. She returned to the emergency department in February 2013 complaining of pain all over. R. 461. Her range of motion was preserved, but she made very deliberate, slow movements. R. 462. Again, her symptoms improved with medication. R. 463.

In March 2013, Akin reported to Dr. Ryan Zantow at Thedacare Orthopedics Plus Center for Rehabilitation Services complaining of widespread full-body pain. R. 536. She presented to the appointment in a wheelchair. R. 538. She described the pain as a sharp, burning, aching, and throbbing sensation located throughout her entire body, but specifically involving her head, neck, chest, shoulders, elbows, wrists, hips, thighs, and right foot. Akin stated she was out of work because of the pain. R. 536. Akin noted her treatments included land-based and aquatic-based physical therapy. Dr. Zantow observed that she wore wrist splints because of numbness and tingling in her right hand. *Id.* Once the splints were removed, however, there were no signs of active synovitis or swelling. R. 538. Dr. Zantow did not observe any focal weakness in her arms or legs.

Nevertheless, he noted that Akin was hypersensitive to even light palpation throughout any areas of her neck, shoulder, or upper back. R. 537. Dr. Zantow indicated he was unsure what he could offer her from a rehabilitation perspective and concluded Akin would benefit from a comprehensive pain treatment program. R. 538.

On April 19, 2013, Akin presented to Dr. John Joseph at La Clinica with widespread body pain and headaches. R. 523. She complained of pain involving her neck, shoulders, upper extremities, low back, and lower extremities. Dr. Joseph noted that she continued to do poorly despite being on multiple medications. Akin described her pain as a constant, aching, stabbing, throbbing pain with occasional burning and shooting. She reported frequent headaches that typically started at the base of her head and radiated to the front. She claimed that physical activity aggravated her pain while medication and rest relieved it. *Id.* Akin stated that her pain significantly interfered with her general activity, mood, ability to walk, ability to do household work, relationships with other people, sleep, and enjoyment of life. R. 523. Dr. Joseph discussed pain management with Akin, but she indicated she was quite hesitant to consider any interventional treatments. R. 524.

On October 10, 2013, Akin presented to the emergency department with complaints of neck and back pain. R. 495. She indicated her small dog jumped onto her shoulders and upper back causing an episode of significant pain. She had generalized tenderness over her posterior cervical spine with no focal point tenderness. Her range of motion was painful. R. 496. Akin's symptoms improved after receiving medication. R. 497. In November 2013, Akin appeared for a follow up at La Clinica for her chronic pain. R. 504. She claimed that her pain occurred with walking or standing in one position for too long. She described her pain as burning and throbbing and is only

relieved when she sits or lies down. She indicated that if she sat on a hard stool or chair, her legs went numb. *Id.* She was encouraged to exercise 30 minutes a day, five days a week. R. 505.

On December 27, 2013, Akin established care with Dr. Mauizio Albala at Advanced Pain Management in Appleton, Wisconsin. R. 532. Her chief complaint was entire back pain and migraines. Her pain radiated to her arms and legs. She described her pain as aching, sharp, stabbing, tender, throbbing, and continuous, and it was aggravated by daily activities, standing, and sitting. She claimed that the pain was relieved by heat, changing position, medication, and massages. Akin also reported numbness in her hands and weakness in her hands, arms, and legs. Dr. Albala noted she moved very slowly and had problems with the simplest movements. Her cervical movement was limited by stiffness and some pain. He indicated that she needed help to sit and stand. R. 533. He assessed Akin's Oswestry score as 30 out of 54, indicating moderate functional impairment. R. 534. Dr. Albala planned to slightly change her medication one by one and address each painful area individually. *Id.*

Akin returned to Advanced Pain Management on January 14, 2014 with complaints of overall body pain. R. 530. She described her pain as aching, burning, throbbing, and gnawing, and it was aggravated by daily activities. Akin also reported numbness in her left hand, arm, and leg. Dr. Albala noted weakness in her legs, knees, and hands. He found that her Oswestry score was 36 out of 60, indicating severe functional impairment. *Id.* Akin declined to do deep injections because she was afraid of needles but indicated she would get to the point where the procedure would become a necessity. R. 531. Dr. Albala increased her Fentanyl and Percocet. *Id.*

In March 2014, Akin received an MRI of her lumbar spine. R. 544. The MRI revealed normal alignment of the lumbar vertebrae. There was moderate to severe spinal canal otenouis at

T10-11 secondary to ligamentum flavum hypertrophy. The MRI also revealed disc protrusion at L4-5 with annociated annular rear and mild spinal canal stenosis. R. 545. An MRI of her cervical spine revealed worsening disc herniation at C5-6 which caused moderate spinal stenosis and cord impingement. R. 546.

Also in March, Akin followed up with Carrie Voss, a nurse practitioner, regarding her significant neck and low back pain. R. 527. Akin's Oswestry score was 33 out of 54, indicating moderate functional impairment. R. 528. She complained of numbness, tingling, and weakness in her upper and lower extremities, and these symptoms were most prominent on the left side. She reported that her medications were effective and denied side effects, but claimed she continued to have significant pain. *Id.* In April, Akin again reported to Ms. Voss complaining of mid to low back and neck pain. R. 552. Her pain was aggravated by any type of physical activity, walking, or standing and was relieved by rest, use of a comfortable chair, or a hot bath. Her Oswestry score was 23 out of 50, indicating moderate functional impairment. R. 553. Akin was very fearful of injections but stated she would consider it as an option. *Id.* By May 21, 2014, Akin described her overall body pain as exhausting, gnawing, and burning. R. 550. She also complained of numbness in her arms, hands, and left leg. However, she admitted that with her current medication, she had improvements in her activities of daily living. *Id.* Her Oswestry score was 27 out of 50, indicating moderate functional impairment. R. 551. Ms. Voss told her to continue using her medication as prescribed. *Id.*

The record also contains the opinions of two state consultant physicians who reviewed Akin's file. On August 17, 2012, Dr. Pat Chan concluded from his review of the file that Akin

remained capable for performing work at the sedentary level. R. 79. And on March 12, 2013, Dr. Mina Khorhidi reached the same conclusion from her review of the file. R. 89.

In a written decision issued on July 10, 2014, the ALJ found that Akin suffered from several severe impairments, including degenerative disc disease of the cervical and lumbar spine, fibromyalgia, obesity, and asthma. R. 21. Despite these impairments, the ALJ found that Akin retained the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except for the following limitations: "she can occasionally stoop, crouch and climb ramps and stairs, and never climb ladders, ropes or scaffolds. The claimant can frequently handle, finger and feel. She can have frequent exposure to dust, odors, fumes and pulmonary irritants and can have no exposure to unprotected heights or moving mechanical parts." R. 23. With this RFC and considering her age, education, and work experience, the ALJ found that there are jobs that exist in significant numbers in the national economy that Akin can perform, such as production worker, general office clerk, or cashier. R. 29. Based on these findings, the ALJ concluded Akin was not disabled. R. 30. The ALJ's decision became the final decision of the Commissioner when the Appeals Counsel denied Akin's request for review on September 18, 2015. R. 1. Thereafter, Akin commenced this action for judicial review.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision

denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Assessment of Medical Evidence

Akin argues that the ALJ improperly evaluated the opinions of Dr. Mauizio Albala and Dr. Ahmad Haffar, her treating physicians, as well as Carrie Voss, a nurse practitioner. Akin asserts that the ALJ erred in failing to give controlling weight to the opinions of Dr. Albala and Ms. Voss. As a consequence of this error, Akin contends that the ALJ improperly weighed the opinions of the state agency reviewing physicians, Dr. Pat Chan and Dr. Mina Khorshidi.

Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other

substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R. § 416.927(c)(2); SSR 96–2p; *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson*, 615 F.3d at 749. Put another way, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy*, 705 F.3d at 636 (citations omitted). If the ALJ does not give the treating physician's opinion controlling weight, he must determine the opinion's weight using the factors listed in 20 C.F.R. § 404.1527(c). Although the ALJ is not required to explicitly weigh every factor listed in the regulations, he must sufficiently account for them. *See Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012).

The ALJ should also apply these factors when evaluating the weight of "other medical sources," such as nurse practitioners. *See* 20 C.F.R. § 416.913(d); SSR 06–03p. SSR 06–03p explains that "the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."

The fatal flaw in Akin's argument that the ALJ erred in evaluating the opinion of her treating physicians and nurse practitioner is that none of them offered any opinion on whether she was capable of work or what her functional limitations actually were. Like most health care professionals, they wrote down what she told them about her pain and limitations, assumed she was telling them the truth, performed physical examinations and conducted various diagnostic tests in an

14

effort to determine the underlying cause or causes of her complaints, and prescribed medications in the hope that they would alleviate the symptoms she described. None of them offered any opinion, however, as to what she could or could not do in a work setting.

As the Commissioner correctly observes, "[n]ot all statements by physicians qualify as medical opinions." Mem. in Supp. at 4, ECF No. 19. This is especially true when the physician is simply recording the patient's complaints. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). Although the doctors that treated and examined Akin offered opinions as to her diagnosis and treatment, none offered any opinion as to "what [she] can still do despite impairment(s), and [her] physical or mental restrictions." At least Akin has not brought any such opinion to the court's attention.

Akin suggests that the Oswestry scores noted in Dr. Albala's reports constitute medical opinions. Pl.'s Br. at 16. She notes that Dr. Albala assessed her Oswestry score twice: "On 12/27/13 Plaintiff's Oswestry score was 30 out of 54 denoting moderate functional impairment. Tr. 562. On 1/14/14 Plaintiff's Oswestry score was 36 out of 60 denoting severe functional impairment. Tr. 558." *Id.* In light of these scores, Akin argues that the ALJ was wrong in concluding that Dr. Albala determined she had only a moderate functional impairment. *Id.*

But an Oswestry score is not a medical opinion. It is instead a calculation based on the patient's answers to a series of questions in which she is asked to rate her own pain and functioning:

> The Oswestry Low Back Pain Disability Index utilizes a patient questionnaire containing six statements (denoted by the letters A through F) in each of ten sections. The questions concern impairments like pain, and the ability to cope with such things

as personal care, lifting, reading, driving, and recreation. For each section, the patient chooses the statement that best describes their status. The designers of the test interpret "percentage of disability" scores in this manner: 0% to 20% = minimal disability; 20% to 40% = moderate disability; 40% to 60% = severe disability; 60% to 80% = crippled; and 80% to 100% = bed bound (or exaggerating symptoms).

*Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *7 n.6 (E.D. Wis. Apr. 9, 2011); *see also*

*Oswestry Disability Index Scoring Made Easy*, 90 Ann. R. Coll. Surg. Engl. 497, 497–99 (Sept.

2008), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647244/. Moreover, Akin has

ignored the fact that Nurse Practitioner Voss also assessed her as having only a moderate functional

impairment with an Oswestry score of 33 out of 54 on March 5, 2014. R. 528. And given the rules

for interpreting the results, it is not clear why Dr. Albala concluded that Akin's score of 36 out of

60 indicated a severe rather than moderate functional impairment. Regardless, the ALJ did not err

in giving little weight to Dr. Albala's opinion since he did not offer any medical opinion of his own

regarding the degree of Akin's functional limitations.

Even if the Oswestry scores were viewed as medical opinions, they are not inconsistent with

the ALJ's findings. As the Commissioner points out, Akin's scores, with one possible exception,

correlate to the "moderate disability" category and are not "inherently work-preclusive." Mem. in

Supp. at 6. And because they provide no specific work-related functional limitations, the ALJ did

not err in giving them little weight. *See Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) ("Given

that Dr. Lloyd failed to venture an opinion as to the extent of Books's limitations or as to his residual

capabilities, the evidentiary usefulness of his findings is slight, at best."). Thus, the ALJ reasonably

concluded that the opinions offered by Dr. Albala and Ms. Voss were "vague, in that they did not

offer specific work-related functional limitations." R. 28.

The same is true of the other physicians who examined and treated Akin. While their reports set forth Akin's complaints and their own findings, none offered any opinion concerning Akin's functional capacity. Akin complains that the ALJ failed to address the opinions provided by Dr. Haffar. Pl.'s Br. at 19. Yet, Akin fails to say what opinion Dr. Haffar offered. This court's review of the record discloses no opinion by Dr. Haffar as to Akin's functional capacity. The ALJ acknowledged that in the "History of Present Illness" section of the consultative report he prepared, Dr. Haffar noted that Akin had been "unable to work for the previous four or five years." R. 24. As the ALJ recognized, however, "this was a recitation of the claimant's reports rather than an opinion offered by Dr. Haffar regarding the claimant's ability to work." *Id.* Other than noting that the cited report appears to have been that of Dr. Thomas Bartow, who saw Akin in May 2012, the ALJ's reading of the report is entirely reasonable and consistent with the overall tone and context of Dr. Bartow's evaluation. R. 402–05.

In the absence of any opinions by Akin's examining and treating physicians and other health care professionals, it was entirely reasonable for the ALJ to credit the opinions of the two state agency physicians who actually offered opinions on Akin's functional capacity based on their review of the record as a whole. Both Dr. Pat Chan and Dr. Mina Khorshidi opined that Akin could perform sedentary exertional work consistent with the RFC finding the ALJ ultimately made. R. 28. Akin contends that the ALJ improperly weighed the state agency reviewing physicians' opinions because they did not review all of the medical records ultimately added to the record. Pl.'s Br. at 21–22. Dr. Chan completed his physical residual functional capacity assessment in August 2012 and Dr. Khorshidi completed her assessment in March 2013. R. 79, 90. Akin appeared before the ALJ for her hearing more than a year later on June 9, 2014. As such, the state agency examiners did not

have an opportunity to review more than a year of medical records, including the treatment records of Dr. Joseph and Dr. Albala, as well as the MRIs of her lumbar and cervical spine from March 2014.

Even though the state agency physicians did not review the entire record, it was not unreasonable for the ALJ to credit their opinions of Akin's RFC based on the review they were able to complete. Their opinions were obviously relevant since Akin was claiming that she had been unable to work since December 2008, later amended to June 8, 2011, some three years before her hearing. Having reviewed the medical records and other evidence of her condition over most of the period Akin claimed she was unable to work, the opinion of the state agency physicians that she could perform at least sedentary work was important to the ALJ's ultimate conclusion that she was not disabled at least up to the time of their review.

Moreover, it was not on the opinions of the state agency physicians alone that the ALJ based his ultimate finding that Akin was not disabled. The ALJ also conducted an extensive review of the medical evidence, including the observations and findings from several physical examinations conducted after the review of the state agency physicians, as well as the level of treatment Akin had undergone and her daily activities. R. 28. He noted that their opinions "generally are consistent with the observations of examiners and with the claimant's level of treatment." *Id.* It is also clear from his decision that the ALJ realized the state agency physicians had not viewed all of the records. It was for this reason that he "included additional non-exertional limitations in the above-referenced residual functional capacity after considering the updated evidence, particularly the recent MRIs." *Id.*

In sum, I conclude that the ALJ did not err in failing to assess the medical opinions of Akin's treating and examining physicians in accordance with 20 C.F.R. § 416.927(b) and SSR 96–2p. Since

no medical opinions concerning her functional capacity was offered by them, there was nothing for the ALJ to assess under those provisions. I also conclude that the ALJ did not err in crediting the opinions offered by the state agency physicians, even though they were not based on the entire file.

## B. Credibility Assessment

Akin also challenges the ALJ's credibility determination. Pl.'s Br. at 23. An ALJ's credibility determination is entitled to "special deference." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (citing *Simms v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). Nevertheless, the ALJ is required to build an "accurate and logical bridge" between the evidence and his conclusion. *Castile*, 617 F.3d at 929. An ALJ's credibility determination will be overturned only if it is "patently wrong." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

In evaluating a claimant's symptoms, an ALJ must engage in a two-step process. The ALJ first determines whether the claimant has established a medically determinable impairment which could reasonably be expected to produce the pain alleged. 20 C.F.R. § 404.929(b). If such an impairment exists, the ALJ assesses the intensity, persistence, and limiting effects of the individual's symptoms to determine whether the symptoms limit her capacity for work. 20 C.F.R. § 404.929(c)(1). Whenever the claimant's statements regarding the intensity, persistence, or limiting effects of pain are not substantiated by the objective medical evidence, the ALJ considers the claimant's daily activities; the location, duration, frequency, and intensity of her pain; the precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication she takes or has taken to alleviate the pain; other treatment; and any other factors concerning her functional limitations and restrictions. 20 C.F.R. § 404.929(c)(3).

At the first step of the sub-analysis, the ALJ found that Akin's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 24. At the second stage, however, the ALJ concluded Akin's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.*

Akin argues that the ALJ solely relied on the objective medical evidence to find that she was not credible. An ALJ may not discredit the claimant's subjective complaints of pain and limitations merely because of a lack of corroborating medical evidence. *Bjornson v. Astrue*, 671 F.3d 640, 648 (7th Cir. 2012). But that is not what the ALJ did in this case. Here, the ALJ supported his credibility determination with the objective medical evidence, the observations of examiners, Akin's activities of daily living, and her level of treatment. For example, the ALJ explained that despite Akin's complaint about constant and debilitating pain, findings on physical examination on May 26, 2012 revealed full range of motion in her back with no spinal tenderness and full, normal range of motion of extremities. She retained 5/5 strength and demonstrated normal gait and grossly intact sensation. R. 25 (citing R. 416–17). "The claimant's normal gait, retained strength and retained range of motion," the ALJ reasoned, "suggest that her symptoms were not as limiting as alleged in May of 2012, the month of her application date." R. 25.

This is precisely the kind of analysis the SSA encourages ALJs to use in SSR 16–3p, its new Ruling on Evaluation of Symptoms in Disability Claims. The Ruling explains:

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or

20

other symptoms than test results and statements that are consistent with other evidence in the record.

SSR 16–3p, 2016 WL 1119029, at *5 (Mar. 16, 2016). By way of example, the Ruling then notes that "an individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result." "If no muscle wasting were present," the Ruling continues, "we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms." *Id.* That is precisely what the ALJ concluded here.

Moreover, the ALJ did not just cite the findings of one examination. He noted that in October 2013, Akin presented to the emergency room at Mercy Medical Center with complaints of back and neck pain. On examination, the ALJ noted, she had full range of motion in her extremities, but generalized tenderness over her cervical spine and pain with range of motion. She also had tenderness over multiple areas of her lumbar and thoracic spine and pain with range of motion of her back. Nevertheless, she retained 5/5 motor strength in all her extremities, and her sensation was intact. R. 26 (citing R. 495). The ALJ reasoned that while "claimant's tenderness and pain with range of motion of her spine justifies some limitations, . . . the claimant's retained strength and full range of motion in her extremities is consistent with the ability to perform the exertional, postural and manipulative activities contemplated by the above-referenced residual functional capacity." R. 26.

The ALJ likewise pointed to Akin's November 2013 examination where it was again noted she had full range of motion in the bilateral upper and lower extremities, normal gait and strength,

and was able to walk on her heels and toes. R. 26 (citing R. 505). Although she also had tenderness throughout her back and neck, and limited range of motion in extension and side bending to the right, the ALJ again noted that while these symptoms supported some limitations, her retained strength and normal gait suggested that she retained the ability to perform tasks contemplated by the RFC he found. R. 26.

Evidence that Akin might be exaggerating her symptoms is also apparent in the ALJ's discussion of her March 2013 presentation to Dr. Zantow for a consultation regarding her full body pain. Akin presented in a wheel chair and was wearing bilateral resting wrist splints. R. 25. Dr. Zantow noted that upon removal of her splints, "there were no signs of active synovitis or swelling," nor did he observe "any focal weakness in the arms or legs." *Id.* (citing R. 538). The ALJ concluded that "the claimant's presentation in a wheelchair and use of resting splints was not consistent with the findings and observations of examiners." R. 25. Again, the ALJ noted that "[w]hile the claimant's pain and palpitation and reduced range of motion support some limitations, they do not support limitations beyond those included in the above-referenced residual functional capacity."

Additional evidence the ALJ considered in assessing the credibility of her statements concerning the intensity, persistence, and limiting effects of her symptoms was the conservative course of her treatment and her refusal to try any form of interventional treatment recommended by her physicians. In April 2013, Akin was seen by Dr. John Joseph for yet another consultation. Upon physical examination, Dr. Joseph noted Akin walked with a normal gait and was able to walk on heel and toe without much difficulty. R. 522. She had focal tenderness over what appeared to be C3-C4 facet joints bilaterally and diffuse tenderness along the lumbar paraspinal muscles and also over the trochanteric burse bilaterally. Straight leg raising was negative bilaterally, and Patrick's and

Gaensien's tests were negative. Based on his examination and the history she provided, Dr. Joseph recommended that Akin consider the comprehensive pain management program at Mercy Medical Center under the guidance of Dr. Christine Heinke, PhD. He also advised her to try Topamax and stay away from opioid medications since they could potentially make her fibromyalgia worse from opioid-induced hyperalgesia. As far as neck pain was concerned, Dr. Joseph thought Akin could potentially benefit from cervical facet joint injection at C3-C4 levels, but Akin was "quite hesitant to consider any type of interventional treatments." R. 524. Akin later told Ms. Voss that she did not appreciate the interaction she had with Dr. Joseph and did not want to go there anymore. R. 552. Even after the March 2014 MRI of her cervical spine showed worsening disc herniation at C5-C6, Akin expressed fear and only agreed to consider an injection. R. 553. Noting this history, the ALJ reasonably observed that "[t]his conservative course of treatment is not consistent with the claimant's allegations of disabling symptoms and limitations." R. 26.

Akin argues that the ALJ "failed to distinguish what course of treatment would have been more appropriate for Plaintiff's impairments" and thus "failed to build the requisite accurate and logical bridge from the evidence to his conclusions." Pl.'s Br. at 24. But it is not the ALJ's role to determine what course of treatment is most appropriate. Here, the ALJ simply recognized that if Akin had been suffering the debilitating pain she claimed for as long a period as she claimed due to the type of degenerative disc disease revealed in the most recent MRI's of her cervical spine, it would have been reasonable for her to seek relief from the medical interventions commonly used to treat such conditions, beginning with steroidal injections. Akin also contends that her doctors advised against surgery because "she had a progressive disease." *Id.* The only evidence she cites

23

to support this contention, however, is her own hearing testimony, and since she had only recently agreed to try the injections, it is not clear whether surgery would even be necessary. R. 60.

Finally, I would note that even if the recent changes in her cervical spine shown by the March 2014 MRI are causing more significant pain and disability than she was previously experiencing, this would not warrant a finding of disability at this time. That change had only recently been discovered at the time of the hearing in June 2014, and Akin had not yet tried the recommended treatment. Ultimately, if the injections and any other medical intervention doctors may recommend are ineffective in reducing pain and restoring function, the degenerative changes in her cervical spine may warrant a finding that Akin is disabled. But until those interventions are tried, it was not unreasonable for the ALJ to conclude she was not disabled. To the extent the degenerative changes in her cervical spine constitute a new impairment or aggravation of an old one, there was no basis for the ALJ to find that it would last more than the requisite twelve months.

Akin also claims that the ALJ improperly evaluated her activities of daily living. The ALJ found that her daily activities suggested that her conditions are not as limiting as she alleged. R. 27. He began his analysis by summarizing Akin's daily activities. The ALJ noted that she has difficulty managing her personal care but can prepare simple meals. She goes grocery shopping but needs to do so with an electric cart and the assistance of others. He indicated that at the hearing, Akin testified that although she can do some household chores if she takes frequent breaks, the chores are generally completed by her two children, ages 11 and 16. Akin is able to drive for one to two hours if she is comfortable but otherwise can only drive for 30 minutes at a time. Akin also goes to a lake with her children and lies on floats in the water. The ALJ concluded that "[w]hile the claimant's

24

reported activities of daily living are consistent with some functional limitations, they are also consistent with the ability to perform sedentary exertional work." *Id.*

Akin argues that the ALJ improperly equated her ability to perform activities of daily living with an ability to work full-time in assessing her credibility. Pl.'s Br. at 26. Leaving aside the illogic of using a claimant's statements about what they do each day to evaluate the credibility of the same claimant's statements about what they can do in general, Akin has a point. The Seventh Circuit has, time and again, chastised ALJs for finding that a claimant can work a full-time job simply because she can perform certain chores at home. *See Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Roddy*, 705 F.3d at 639. An individual's "ability to perform daily activities, especially if they can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy*, 705 F.3d at 639; *Bjornson*, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer.").

But there are two different ways an ALJ can use a claimant's admitted daily activities to assess the credibility of his or her claim. Daily activities can be viewed as evidence that the claimant is in fact able to perform full-time work at a particular exertional level. Evidence that a claimant goes hiking every day with his five-year-old grandson on his back, for example, would belie his claim that he is incapable of performing sedentary or even light work. Not surprisingly, it is the rare claimant who offers such evidence. The more common way in which a claimant's statements describing his or her daily activities can be used to assess the credibility of the claimant's statements

25

concerning the intensity, persistence, or limiting effects of the claimant's symptoms is where the ALJ finds the admitted activities, though not enough to equate with full-time work, are inconsistent with the degree of pain and limitation claimed. In other words, if the claimant engages in activities that her claimed limitations would seem to preclude, an ALJ can reasonably conclude that the clamant is not telling the truth about, or at least exaggerating, her symptoms. While that alone may not be enough to show the claimant is capable of full-time employment, it is a reason for doubting other statements the claimant makes. *See Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability.").

Here, the ALJ utilized the second way of using Akin's admitted activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her impairments, at least in part. He noted that Akin's reports of her activities "suggests that the claimant's conditions are not as limiting as alleged." R. 27. Akin alleged extreme limitations in walking, standing, sitting, and lifting, yet reported activities that the ALJ thought suggested she was capable of more than she alleged. Overall, it appears that the ALJ concluded that if in fact Akin had as much pain and was as limited as she claimed, then she would have been unlikely to perform even the limited activities she described. And given the extremely limited RFC the ALJ found, the conclusion that her activities were consistent with the ability to perform work within that RFC was not unreasonable. Finally, the ALJ noted that "the claimant's inconsistent work history even before

her alleged disability onset date, further diminish[ed] the credibility of her alleged symptoms and limitations." R. 27–28.

To be sure, more detailed analysis of the activities of daily living would have been helpful. But I cannot say that the ALJ's credibility determination is "patently wrong," especially in light of the other reasons provided. *Prochaska*, 454 F.3d at 738. The ALJ clearly disbelieved the extent of Akin's complaints, as he was entitled to do, especially in light of the contradictory medical evidence—a point specifically noted by the ALJ. "[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *see also Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). The question is not whether the ALJ has provided conclusive evidence that Akin's testimony and statements that she is incapable of performing even a limited form of sedentary work is not true. If conclusive evidence was required, few claims could ever be denied. Conclusive evidence is rarely, if ever, available in social security cases, especially when dealing with conditions such as back pain and fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 British Med.J. 386 (1995); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir.1988) (per curiam), but most do not and the question is whether Sarchet is one of the minority."). Distinguishing between what a person cannot do and what a person will not do is often difficult, even for the person herself. The question for this court to decide is whether the ALJ has provided a logical bridge supported by the evidence in the record to the conclusion he reached. Here, I conclude that he did.

## C. RFC Assessment and Hypothetical Question

The ALJ created an RFC determining Akin has the capacity to perform sedentary work with the following restrictions: she can occasionally stoop, crouch, and climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can frequently handle, finger, and feel; she can have frequent exposure to dust, odors, fumes, and pulmonary irritants; and she can have no exposure to unprotected heights or moving mechanical parts. R. 23. Akin argues the ALJ's RFC assessment is flawed because it does not reflect all of her limitations. For the most part, however, Akin's argument is predicated on claims that have already been addressed.

Akin asserts, for example that the ALJ erred in failing to incorporate into the RFC limitations documented by Drs. Albala and Haffar. Pl.'s Br. at 26–27. But as discussed above, neither Dr. Albala nor Dr. Haffar set any limitations on Akin's activity. Their reports record Akin's complaints and their own findings on physical examination. To repeat, none of the treating or examining physicians offered any medical opinion concerning what Akin could or could not do. The ALJ did not error in failing to incorporate limitations they did not set into her RFC.

Akin also cites a patient assessment report by a physical therapist who found on May 16, 2011, that Akin had reduced strength in the upper extremities and reduced range of motion in the cervical spine. Pl.'s Br. at 27. She fails to explain, however, why those findings, should have required the ALJ to include additional limitations when a year later, on May 26, 2012, she was found to have no tenderness and full range of motion in her neck and back, and full muscle strength and range of motion in her extremities. R. 416–17. As recounted above, similar findings were made by other physicians long after May 2011.

Akin also contends that the ALJ erred in failing to include in her RFC additional limitations that would account for her repeated complaints of headache and her decreased sensation in her hands. Pl.'s Br. at 27–28. She also challenges the ALJ's finding that her headaches were not a severe impairment, noting that a CT scan cannot prove headaches. *Id.* at 27. Akin notes that she reported to health care personnel that she has frequent headaches, as often as "a couple of times a week for a couple of hours," and that "[w]hen the headaches get really bad, she has to lay down and nap in the bedroom where it's dark." Pl.'s Br. at 28. In light of this evidence, Akin contends that the ALJ erred in finding she had a RFC that would allow her to hold a job.

As the Commissioner contends, however, the ALJ arrived at the RFC finding "by weighing the record evidence as a whole, including the opinions and findings of the treating, examining, and state agency reviewing physicians." Mem. in Supp. at 13. Akin's complaints of headaches and decreased sensation in her hands are symptoms and, by themselves, do not constitute sufficient evidence of physical impairments separate and apart from the severe impairments the ALJ found. Subjective complaints to a treating source are "the opposite of objective medical evidence and an ALJ is not compelled to accept them." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").

Under the SSA's own rules, a plaintiff's "'statements (or those of another person) alone . . . are not enough to establish that there is a physical or mental impairment.'" *Johnson v. Colvin*, No. 2-13-CV-138-PRC, 2014 WL 4722529, at *13 (N.D. Ind. Sept. 22, 2014) (quoting 20 C.F.R. § 416.928(a)). Rather, signs, symptoms, and laboratory findings are required to establish a medically

determinable impairment. SSR 96–4p, 1996 WL 374187, at *1 (July 2, 1996). More specifically, the Ruling provides:

> Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings.

*Id.*; *see also Pawlowski v. Astrue*, 800 F. Supp. 2d 958, 968 (N.D. Ill. 2011) ("Similarly, Ms. Pawlowski's complaints to her physician are not medical evidence, but merely her own description of her symptoms."). Akin has pointed to no medical report that includes more than a recitation of her own statement that she suffers from severe headaches or decreased sensitivity in her hands. She has pointed to no medical signs or laboratory findings that establish any additional impairments beyond what the ALJ found.

And as for the symptoms themselves, the ALJ found that Akin's statements concerning the intensity, persistence, or limiting effects of her alleged symptoms were not credible for the reasons set forth in the decision and already addressed herein. In sum, the ALJ carefully considered all of the evidence, including the medical findings and opinions, and concluded that Akin was capable of a reduced range of sedentary work. He created a logical bridge explaining how the evidence supported his assessment of Akin's RFC. Having found no error, I conclude that the decision of the Commissioner should be affirmed.

**CONCLUSION**

At the hearing before the ALJ in June 2014, the attorney then representing her focused on the "later evidence," specifically the March 2014 MRIs showing degenerative changes in her spine, in arguing that Akin was unable to work. R. 43. This is also the evidence that her current attorney has focused on in arguing that the ALJ erred in crediting the opinions of the state agency physicians that were provided before such evidence was available. Pl.'s Br. at 21–22. As noted above, to the extent this evidence reveals a new impairment or aggravation of an old impairment for which Akin was just beginning treatment, any finding of disability based on such evidence would have been premature at the time of the hearing only three months later. The ALJ did not err in finding Akin not disabled based on the evidence before him. The Commissioner's decision is therefore affirmed, and the Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this  23rd  day of February, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court